02-09-222-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-09-00222-CR

 

 


 
 
 Mark Alan McCulley
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

------------

FROM THE 89th
District Court OF Wichita COUNTY

------------

OPINION

------------

I.  Introduction

          Appellant
Mark Alan McCulley appeals his conviction for murder.  In two points, McCulley
contends that the trial court erred by determining that he was not in custody
at the time he made incriminating statements to the police and by determining
that he did not invoke his right to terminate the interview.  Because we hold
that the police cured their failure to timely advise McCulley of his rights,
and because we hold that McCulley never unambiguously invoked his right to
terminate the interview, we will affirm.

II.  Background

McCulley
called the police on the night of May 20, 2007.  When police arrived at his
house, McCulley was covered in blood and his wife had been stabbed.  The police
took McCulley to the hospital, where an ambulance transported his wife, who
later died.  The police extensively photographed McCulley.  From there,
McCulley accompanied the police to the police station, where the police
questioned him for almost four and one-half hours.  McCulley eventually
implicated himself in his wife’s death.  Before trial, McCulley filed a motion
to suppress the statement he made to police.  The trial court held a suppression
hearing.

At
the suppression hearing, the State called Detective Kelly Brunson of the City
of Wichita Falls Police Department to testify.  Brunson testified that he was
trained in conducting interviews for the police department.  He averred that he
also had been trained regarding Miranda warnings and the warnings
contained in Texas Code of Criminal Procedure article 38.22.  According to
Brunson, his sergeant called him on the night of May 20, 2007.  The sergeant
sent Brunson to the hospital to “view the body and to speak to [] McCulley.” 
After McCulley consented to the search of his house, Brunson said that he asked
McCulley to go to the police station so that he could interview him.  Brunson
testified that McCulley obliged and that another officer brought McCulley to
the police station.  He also said that McCulley was not a suspect at this time
and that the interview was intended to “gather leads and any intelligence he
might have to try to find out what happened.”  Brunson said that the videotaped
interview began shortly before 1:00 a.m. on May 21.

Brunson
said that as he interviewed McCulley, he had McCulley verify to him that he was
there of his own free will, and Brunson said that McCulley freely answered his
questions.  Brunson testified, as the video of the interview played for the
trial court, that after asking McCulley, “is there anything that you haven’t
talked about that might help me out on this case, anything at all that might
help me, “ McCulley responded, “I just want to see her,” and “I just want to go
to the hospital.”  After telling McCulley that his wife “was still at the
hospital,” Brunson told McCulley that he could see her “as soon as we finish here.”

Brunson
said that during the interview, he reminded McCulley that he was still free to
leave:  “I was just making sure that he understood that he was there on his own
free will, that he wasn’t under arrest and he wasn’t charged with any
offense.“  Brunson testified that his specific statement was “You’re here under
your own free will, you still understand that, right?”  McCulley responded, “I
would like to go to the hospital.”  Brunson responded, “Even if we let you go
to the hospital, . . . I don’t know if we would let you see your wife
right away,” and “Now’s probably not a good time to see her.”  When asked what
would have happened if McCulley had gone to the hospital, Brunson said, “I
wouldn’t have let him see her [body].”

Brunson
testified that after asking to go to the hospital, McCulley asked, “Can I go
home?”  Brunson responded that the police were still at his house and that he
could take him there as soon as they were finished.  As the interview
continued, Brunson said that another detective stepped into the interview
room.  Brunson explained to the other detective that McCulley wanted to see his
wife and that Brunson had told McCulley it probably wasn’t a “good idea at this
time.”  The detective responded that she did not think it was a good idea for
McCulley to see his wife and also that the police would be at his home for some
time.  McCulley asked again, “Can I go home?”  He was told again that it was
not a good idea.  Brunson said that what the detective meant when she said that
the police would be at McCulley’s home for a while was that the police would be
processing crime-scene evidence and no one would be allowed in the home. 
Brunson said that even after these requests, McCulley was not a suspect at this
time and that he was still free to leave the interview.

By
Brunson’s account, if McCulley were to leave the police station, an officer
“would have transported him.”  Brunson acknowledged that McCulley was not
wearing shoes.  Brunson said that McCulley’s transportation “would have been up
to me.”  An hour into the interview, Brunson asked McCulley whether he had
committed the murder.  Later, Brunson explained to McCulley that the person
closest to the victim is often the suspect in a murder.  Brunson maintained
that for the majority of the nearly four and one-half hour interview, McCulley
was free to leave at any time but that to leave would have required Brunson’s
assistance because “it’s . . . kind of a sneaky way out.”  When asked
directly how McCulley would have left the police station, Brunson said, “I
would have to had shown him the way out.”

Brunson
said that just before 5:00 a.m., he and McCulley read McCulley’s Miranda
rights and his article 38.22 rights together.  Brunson averred that McCulley
acknowledged that he understood his rights.  When asked whether he was still
willing to talk to Brunson, McCulley responded, “Can I just go to sleep?”  Brunson
responded, “We need to talk.  We need to get things worked out.”  He told
McCulley, “You can go to sleep when we’re done.”  But Brunson also said, “If
you want to invoke your rights, that’s your right also."  McCulley said,
“I’ll talk to you,” and signed a waiver that he understood his rights and that
he was talking to the police voluntarily.  According to Brunson, he did not
have probable cause to arrest McCulley even at this juncture, but McCulley “was
becoming a focus of the investigation.”  At that time, another detective
entered the room, and McCulley said, in response to the detective’s question about
how he was doing, that he was not doing well because he was being charged with
murder.  The detective responded that McCulley was not actually being charged
at this time.  But Brunson did testify that at this time, McCulley was no
longer free to leave.  The trial court denied McCulley’s motion to suppress.

The
video of the interview reflects many of the statements Brunson testified to. 
In the video, as the interview begins, Brunson tells McCulley that he is not
under arrest and is not being charged with anything.  Brunson also has McCulley
verify that he knows he is there of his own free will.  It is clear that
McCulley is not wearing shoes.  Less than thirty minutes into the interview,
the questions by the detectives primarily concern McCulley’s timeline of
events.  McCulley’s initial story is that his wife had left earlier that day,
that he was watching a movie, and that his stomach got upset during the movie,
so he went for a walk.  When he arrived home from his walk, he discovered his
wife lying on the living room floor, bleeding.  According to McCulley’s initial
story, she asked for his help and declared that she was dying.

Brunson
asks McCulley about previous physical altercations with his wife and a prior
record of violence with her.  Brunson asks several questions about why McCulley
was not wearing shoes, what shoes he wore when he allegedly went for a walk
during the movie, and when and where he took them off.  Brunson physically examines
McCulley by looking at the bottoms of his feet, looking at his hands, and
lifting up his shirt and examining his torso.  Brunson questions McCulley about
cuts on his hands.  Each time McCulley asks to go home or to the hospital,
Brunson’s responses, although couched in terms of that not being a “good idea”
or not “right now,” were statements suggesting that McCulley could eventually
go to those places, but not during the time the interview was being conducted. 
At one moment, McCulley asks “when” he can go to the hospital.  Brunson
responds, “[A]s soon as we finish here.”  Later, when McCulley asks to go home,
Brunson responds similarly with, “[W]e can take you there when we get
finished.”

Multiple
times during the interview, Brunson asks McCulley whether things had gotten “out
of hand,” and “[D]id you do this?,” and he tells McCulley that the person
closest to the victim is usually the suspect.  Multiple detectives ask McCulley
about the whereabouts of a particular knife.  Multiple detectives also state to
McCulley that his timeline does not make sense.

In
the interview, two detectives other than Brunson also question McCulley.  The
first of the two question him before he was ever given any warnings.  She asks
him about violence in his relationship.  The detective also tells McCulley
that, according to his timeline, he would have been leaving the movie during
its climactic moment.  She tells him directly that his timeline does not make
sense.  After almost four hours, Brunson and McCulley read McCulley’s Miranda
and article 38.22 warnings together.  McCulley eventually states that he had “killed
her” and had thrown the knife in a neighboring yard.

The
State introduced McCulley’s videotaped statement at trial, and a jury found him
guilty of murder.  The jury also found that McCulley acted in the heat of
passion.  See Tex. Penal Code Ann. § 19.02 (West 2011).  McCulley
was sentenced to twenty years’ incarceration.  This appeal followed.

III.  Custody
and the Admissibility of
McCulley’s Statement

In
his first point, McCulley contends that the trial court erred by determining
that he was not in custody at any time during his nearly four and one-half hour
interview with the police.  McCulley does not contend in his brief that the
trial court should have granted his motion to suppress his statement made to
police because he was in custody.  But because that is the logical extension of
his argument, we assume that he intended to argue that his statement should
have been suppressed.

          A.      Custody

          The
prosecution may not use statements, whether exculpatory or inculpatory,
stemming from custodial interrogation of the defendant unless it demonstrates
the use of procedural safeguards effective to secure the privilege against
self-incrimination.  Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct.
1602, 1612  (1966).  Additionally, article 38.22 of the code of criminal
procedure precludes the use of statements that result from custodial
interrogation without compliance with its procedural safeguards.  See
Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005) (providing that no statement
made as a result of a custodial interrogation shall be admissible against the
accused in a criminal proceeding unless, among other things, prior to the
giving of the statement, the statutory warnings are administered to the
accused).

          Custodial
interrogation is questioning initiated by law enforcement officers after a person
has been taken into custody or otherwise deprived of his freedom of action in
any significant way.  Miranda, 384 U.S. at 444, 86 S. Ct. at 1612.  If
an investigation is not at an accusatorial or custodial stage, a person’s Fifth
Amendment rights have not yet come into play, and the voluntariness in waiving
those rights is not implicated.  Melton v. State, 790 S.W.2d 322, 326
(Tex. Crim. App. 1990).

          Four
factors are relevant to determining whether a person is in custody:  (1) probable
cause to arrest, (2) subjective intent of the police, (3) focus of
the investigation, and (4) subjective belief of the defendant.  Dowthitt
v. State, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).  Factors two and four
have become irrelevant except to the extent that they may be manifested in the
words or actions of police officers; the custody determination is based
entirely upon objective circumstances.  Id.; see also Stansbury v.
California, 511 U.S. 318, 322–23, 114 S. Ct. 1526, 1528–29 (1994). 
Simply becoming the focus of the investigation does not necessarily equate to
custody for purposes of determining whether a statement is voluntarily given.  Meek
v. State, 790 S.W.2d 618, 621 (Tex. Crim. App. 1990).

          As
a general rule, when a person voluntarily accompanies law enforcement to a
certain location, even though he knows or should know that law enforcement
suspects that he may have committed or may be implicated in committing a crime,
that person is not restrained or “in custody.”  Livingston v. State, 739
S.W.2d 311, 327 (Tex. Crim. App. 1987), cert. denied, 487 U.S. 1210
(1988).  More specifically, so long as the circumstances show that a person is
acting only upon the invitation, request, or even urging of law enforcement,
and there are no threats, either express or implied, that he will be taken
forcibly, the accompaniment is voluntary, and such person is not in custody.  Anderson
v. State, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996), cert. denied,
521 U.S. 1122 (1997).  But the mere fact that an interrogation begins as
noncustodial does not prevent custody from arising later; police conduct during
the encounter may cause a consensual inquiry to escalate into custodial
interrogation.  Ussery v. State, 651 S.W.2d 767, 770 (Tex. Crim. App. 1983).

          There
are at least four general situations when a suspect’s detention may constitute
custody:  (1) when the suspect is physically deprived of his freedom of
action in any significant way, (2) when a law enforcement officer tells
the suspect that he cannot leave, (3) when law enforcement officers create
a situation that would lead a reasonable person to believe that his freedom of
movement has been significantly restricted, and (4) when there is probable
cause to arrest[1] and law enforcement
officers do not tell the suspect that he is free to leave.  Dowthitt,
931 S.W.2d at 255.  In the first through third situations, the restriction upon
freedom of movement must amount to the degree associated with an arrest as
opposed to an investigative detention.  Id. (citing Stansbury,
511 U.S. at 322–23, 114 S. Ct. at 1528–29).  Concerning the fourth
situation, the officers’ knowledge of probable cause must be manifested to the
subject, and such manifestation could occur if information sustaining the
probable cause is related by the officers to the suspect or by the suspect to
the officers.  Id.; see Ruth v. State, 645 S.W.2d 432, 436 (Tex.
Crim. App. [Panel Op.] 1979) (holding that a suspect’s “statement that he had
shot the victim immediately focused the investigation on him and furnished
probable cause to believe that he had committed an offense[;] [a]fter that
time, the continued interrogation must be considered a custodial one”). 
Situation four, however, will not automatically establish custody; rather,
custody is established if the manifestation of probable cause, combined with
other circumstances, would lead a reasonable person to believe that he is under
restraint to the degree associated with an arrest.  Dowthitt, 931 S.W.2d
at 255.  Additionally, the length of time involved is an important factor to
consider in determining whether a custodial interrogation occurred.  Id.
at 256.

          Here,
according to Brunson, McCulley voluntarily rode with an officer to the police
station from the hospital.  Brunson’s testimony is the only evidence at the
suppression hearing regarding McCulley’s ride to the police station.  This
testimony indicates that McCulley was not in custody when the interview at the
police station began.  Miller v. State, 196 S.W.3d 256, 266 (Tex.
App.—Fort Worth 2006, pet. ref’d) (reasoning that appellant’s choice to
voluntarily meet police at a location demonstrated that police encounter was
initially noncustodial).  McCulley, however, was not wearing shoes and had
blood on his clothing.  At the suppression hearing, Brunson testified that in
order for McCulley to return home or to the hospital, the police would have
needed to transport him.  When asked whether McCulley was dependent upon the police
for transportation, Brunson answered, “It would have been up to me.”  Brunson
also averred that leaving the interrogation room would have been difficult,
requiring knowledge of a “sneaky way out,” so much so that Brunson said more
than once that he would have been required to escort McCulley out of the
building.  When taken as a whole, we conclude that McCulley was physically
deprived of his freedom in a significant way.

          And
even though the police never directly told McCulley that he could not leave, a
reasonable person in McCulley’s situation would have believed that his freedom
of movement had been significantly restricted.  Each time McCulley indicated a
desire to go to the hospital or his home, the police indicated that he could
not go to those places until the police were “finished.”  Furthermore, the
police possessed probable cause that McCulley had committed the murder, and
Brunson expressed this directly to McCulley several times during questioning. 
The questioning in the video reflects an interview primarily focused on
McCulley.  His version of his timeline was the subject of most of the questions
asked by multiple police officers.  Regarding McCulley’s statement that he had
been on a walk only to come home and find that his wife had been stabbed,
Brunson asked McCulley several questions about his lack of shoes and when he
had taken them off.  Brunson asked McCulley multiple times, “Did you do this?,”
and if things had gotten “out of hand.”  Brunson also examined McCulley’s
hands, asked about cuts on his fingers, examined the bottoms of his feet, and
even had him raise up his shirt to physically examine his torso.  McCulley had
already been photographed in this same manner at the hospital before he went to
the interrogation room.  Multiple police officers directed questions to
McCulley that focused on the murder weapon.

          At
one point, Brunson explained to McCulley that the person closest to the victim
was a natural suspect.  McCulley responded “I’m probably in trouble.”  This
statement later served as one of Brunson’s transitions back to questioning
McCulley about his timeline and about whether McCulley had been the one who
stabbed his wife.  McCulley was also told directly that his timeline did not
make sense, and detectives asked him why he would leave the movie he was
watching at such a climactic moment.  Again, all of these questions were framed
by McCulley’s questions about when he could go home or to the hospital, and
each time those requests were rebuffed with statements indicating that McCulley
could not go to either of those places and, moreover, could not leave until the
officers were finished questioning him.  Police finally read McCulley his
rights almost four hours after they brought him to the interrogation room.  See
Dowthitt, 931 S.W.2d at 255–56 (reasoning that the length of time involved
is an important factor to consider in determining whether a custodial
interrogation occurred).  We conclude that McCulley was in custody and the
focus of the police’s investigation well before 4:55 a.m., when police finally
read McCulley his Miranda and article 38.22 warnings.  See id.,
931 S.W.2d at 254 (holding that a suspect being the focus of police
investigation is a relevant factor in determining whether suspect is in
custody).  But our analysis does not end with this conclusion.

          B.      McCulley’s
Custodial Statement

          The
real question in McCulley’s first point is whether the trial court erred by
overruling his motion to suppress his statement that was the result of
custodial interrogation without the benefit of police timely providing him with
Miranda and article 38.22 warnings.

                   1.       Standard
of Review

          We
review a trial court’s ruling on a motion to suppress evidence under a
bifurcated standard of review.  Amador v. State, 221 S.W.3d 666, 673
(Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  We give almost total deference to a trial court’s rulings on
questions of historical fact and application-of-law-to-fact questions that turn
on an evaluation of credibility and demeanor, but we review de novo
application-of-law-to-fact questions that do not turn on credibility and
demeanor.  Amador, 221 S.W.3d at 673; Estrada v. State, 154
S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson v. State, 68 S.W.3d 644,
652-53 (Tex. Crim. App. 2002).

                    2.       Midstream
Miranda Warnings

          Generally,
the failure to give timely Miranda warnings[2]
results in the prosecution being required to forfeit the use of any statement
obtained during that interrogation during its case-in-chief.  Missouri v.
Seibert, 542 U.S. 600, 608, 124 S. Ct. 2601, 2608 (2004); Martinez,
272 S.W.3d at 620.  But not every violation of Miranda requires
suppression of the evidence obtained; evidence is admissible when the central
concerns of Miranda are not likely to be implicated and when other
objectives of the criminal justice system are best served by its introduction. 
Martinez, 272 S.W.3d at 624 (citing Seibert, 542 U.S. at 618–19,
124 S. Ct. at 2614) (Kennedy, J., concurring).  A suspect who has once
responded to unwarned yet uncoercive questioning is not thereby disabled from
waiving his rights and confessing after he has been given the requisite Miranda
warnings.  Oregon v. Elstad, 470 U.S. 298, 318, 105 S. Ct. 1285,
1297–98 (1985).  The central question when determining the admissibility of
post-Miranda warning confessions made after Miranda violations is
whether the evidence shows that the officer deliberately employed a two-step
“question first, warn later” interrogation technique to circumvent the suspect’s
Miranda protections.  Carter, 309 S.W.3d at 36.  This is so
because when the warnings are inserted in the midst of coordinated and
continuing interrogation, they are likely to mislead and deprive a defendant of
knowledge essential to his ability to understand the nature of his rights and
the consequences of abandoning them.  Martinez, 272 S.W.3d at 626, n.20
(citing Moran v. Burbine, 475 U.S. 412, 423–24, 106 S. Ct. 1135,
1142 (1986)).  When a question-first interrogation begins, it cannot be known
whether the suspect will incriminate himself, but the suspect’s rights as set
out in Miranda have already been violated.  Martinez, 272 S.W.3d
at 624.  And it is immaterial whether incriminating statements emerged from the
unwarned portion of the interrogation.  Id.  If a deliberate two-step
question-first strategy has been used, post-Miranda statements that are
related to the substance of pre-Miranda statements must be excluded
unless curative measures are taken before the post-Miranda statements are
made.  Id. at 626–27.  No curative steps were taken in this case.

          Here,
police should have given McCulley his Miranda and article 38.22 warnings
at the moment his interview turned from an investigation to an interrogation. 
Therefore, we must determine whether the police deliberately employed a
two-step question-first strategy in an effort to thwart McCulley’s
understanding of his rights.

3.       No Deliberate Tactic by Police to Undermine Miranda

          The
standard of review for a trial court’s finding of an officer’s subjective
deliberateness in the “question first, warn later” Miranda context is
that the finding shall not be set aside unless clearly erroneous, and due
regard shall be given to the opportunity of the trial court to judge the
credibility of the witnesses.  Carter, 309 S.W.3d at 38–39.  Because the
“question of whether the interrogating officer deliberately withheld Miranda
warnings will invariably turn on the credibility of the officer’s testimony in
light of the totality of the circumstances surrounding the interrogation,” a
factual finding regarding the officer’s credibility is entitled to deference on
appeal and is reviewed only for clear error.  Id. at 39.

          Here,
the trial court made the specific finding of fact at the suppression hearing that
Brunson was a credible witness.  Brunson testified that he did not believe that
McCulley was in custody at any time during the interview.  Because the question
of whether Brunson deliberately withheld warnings turns on his credibility and
because the trial court determined he was in fact credible, we defer to the
trial court’s determination.  Based on the trial court’s credibility
determination, the record does not show a deliberate tactic to employ a
two-step interrogation technique.  We hold that the record fails to show that
the police deliberately used a two-step, “question first, warn later”
strategy.  See Carter, 309 S.W.3d at 36; see also Ervin, 333
S.W.3d at 213–14) (“Because the trial court found credible the officers’
testimony that appellant was not in custody . . . even if the
officers erred in their belief that she was not in custody, that error does not
amount to a deliberate tactic to circumvent Miranda.”).

4.       McCulley’s Statement was Admissible

          When
the two-step questioning tactic is not deliberately employed, “the
admissibility of any subsequent statement should turn . . . solely on
whether it is knowingly and voluntarily made.”  Elstad, 470 U.S. at 309,
105 S. Ct. at 1293; Carter, 309 S.W.3d at 32.  Thus, the factfinder
must examine all of the circumstances and the course of police conduct in
evaluating the voluntariness of those post-Miranda statements.  Carter,
309 S.W.3d at 41.  We must give great deference “to the trial judge’s decision
to admit or exclude such evidence, which will be overturned on appeal only
where a flagrant abuse of discretion is shown.”  Id. at 42; see
United States v. Stewart, 536 F.3d 714, 723 (7th Cir. 2008) (stating that when
the interrogation process used was not a deliberate end run around Miranda,
a trial court should determine “whether the initial unwarned confession would
flunk the voluntariness standard of Elstad such that the taint would
carry over to the second warned confession”).

          In
this case, the trial judge made specific findings that McCulley’s post-Miranda
statement to police was voluntarily made.  We find that the record and
reasonable inferences from that record support this finding.  Brunson
administered appropriate Miranda and article 38.22 warnings prior to
McCulley’s statement that he had killed his wife.  In the video of the
interview, McCulley repeatedly said that he understood his rights and was
willing to talk to the police.  Thus, predicated on the legal conclusion that
it was voluntarily made, we agree with the trial judge that McCulley’s
statement was admissible.  See Carter, 309 S.W.3d at 37 (holding that
trial court’s finding that defendant’s statement was voluntarily made supported
trial court’s admission of statement despite mid-Miranda warning).  We
overrule McCulley’s first point.

IV.  McCulley’s Right
to Terminate the
Interview

          In
his second point, McCulley contends that the police did not honor his request
to remain silent or to terminate the interview.

          A.      Standard
of Review

          An
appellate court should afford almost total deference to a trial court’s
determination of the historical facts that the record supports, especially when
the trial court’s fact findings are based on an evaluation of credibility and
demeanor.  Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); Hollingsworth
v. State, 15 S.W.3d 586, 591 (Tex. App.—Austin 2000, no pet.).  Appellate
courts should give the same amount of deference to a trial court’s rulings on
“application of law to fact questions,” also known as “mixed questions of law
and fact,” if the resolution of those ultimate questions turns on an evaluation
of credibility and demeanor.  Guzman, 955 S.W.2d at 89; Hargrove v.
State, 162 S.W.3d 313, 318 (Tex. App.—Fort Worth 2005, pet. ref’d). 
Appellate courts review de novo “mixed questions of law and fact” not
falling within this category.  Guzman, 955 S.W.2d at 89; Hargrove,
162 S.W.3d at 318.  At the hearing on a motion to suppress, the trial court is
the sole trier of fact and judge of the witnesses’ credibility and the weight
to be given their testimony.  Ramirez v. State, 44 S.W.3d 107, 109 (Tex.
App.—Austin 2001, no pet.).  The trial judge may choose to believe or
disbelieve any or all of a witness’s testimony.  Id.

B.      Invoking
the Right to Remain Silent

          The
Fifth Amendment privilege against self-incrimination is protected during
custodial interrogation by certain procedural safeguards delineated in Miranda. 
384 U.S. at 444, 86 S. Ct. at 1612.  These “safeguards” have been codified
in the Texas Code of Criminal Procedure.  See Tex. Code Crim. Proc. Ann.
art. 38.22.  Within these principles, the right to terminate a custodial
interrogation is a “critical safeguard” of the right to remain silent.  See
Michigan v. Mosley, 423 U.S. 96, 103, 96 S. Ct. 321, 326 (1975).  No
formal invocation of this right is necessary.  Watson v. State, 762
S.W.2d 591, 597 (Tex. Crim. App. 1988).  If the suspect indicates “in any
manner” that he invokes the right to remain silent, the interrogation must
stop.  Miranda, 384 U.S. at 473–74, 86 S. Ct. at 1627.  But any
indication that the suspect wishes to remain silent must be unambiguous, and
interrogating officers are not required to clarify wishes that are ambiguous.  Dowthitt,
931 S.W.2d at 257.  An officer’s failure to stop custodial interrogation after
an unambiguous invocation of the right to remain silent renders any later
obtained statements inadmissible.  Id.

          “Of
course, when a suspect makes an ambiguous or equivocal statement it will often
be good police practice for the interviewing officers to clarify whether or not
he actually wants” to terminate the questioning.  Davis v. U.S., 512 U.S.
452, 461, 114 S. Ct. 2350, 2356 (1994).  The officer is not, however,
required to ask clarifying questions, and if the suspect’s statement is not an
unambiguous or unequivocal request to terminate the interview or to invoke the
right to silence, the officers have no obligation to stop questioning him.  Davis,
512 U.S. at 461–62, 114 S. Ct. 2356; Ramos v. State, 245 S.W.3d 410,
418 (Tex. Crim. App. 2008).  In determining whether the right to remain silent
was unambiguously invoked, courts look to the totality of the circumstances.  Williams,
257 S.W.3d at 433 (Tex. App.—Austin 2008, pet. ref’d).

          Here,
McCulley contends that his questions about whether he could go to the hospital
or go home, coupled with his statements that he wanted to “go to sleep,” were
sufficient to invoke his right to terminate the interview.  But none of these
statements constitute an unambiguous and unequivocal invocation of the right to
remain silent or otherwise terminate the interview.  And each time, Brunson
followed the statements with clarifying remarks of his own.  In fact, when
McCulley ultimately told Brunson, “I just want to go to sleep,” Brunson did not
simply ignore the statement and continue questioning.  Instead, Brunson sought
to clarify McCulley’s wishes before continuing the interview.  See Marshall
v. State, 210 S.W.3d 618, 628 (Tex. Crim. App. 2006), cert. denied,
552 U.S. 847 (2007) (stating that federal constitutional law does not prohibit
officer from clarifying whether arrestee wished to waive right to remain
silent); Williams v. State, 257 S.W.3d at 432 (same).  Brunson even told
McCulley, “If you want to invoke your rights, that’s your right, also.” 
McCulley replied, “I’ll talk to you.”  Giving due deference to the factfinder’s
credibility determinations, we conclude that the trial court did not abuse its
discretion by overruling the motion to suppress as pertaining to any right to
remain silent and admitting McCulley’s statement.  See Dowthitt, 931
S.W.2d at 257 (holding that appellant’s statement, “I can’t say more than that.
 I need to rest,” was ambiguous and indicated only that appellant believed that
he was physically unable to continue); Hargrove, 162 S.W.3d at 319
(holding that accused’s statement that he wanted to “terminate it” was
ambiguous and did not require the officer to stop questioning); Franks v.
State, 90 S.W.3d 771, 786–87 (Tex. App.—Fort Worth 2002, no pet.) (holding
defendant’s statement, “I don't want to talk anymore.  I’m tired,” was
ambiguous, and his rights were not violated by the continuation of the
interrogation).  We overrule McCulley’s second point.

V.  Conclusion

          Having
overruled both of McCulley’s points, we affirm the trial court’s judgment.

 

 

BILL MEIER
JUSTICE

 

PANEL:  WALKER, MEIER, and
GABRIEL, JJ.

 

PUBLISH

 

DELIVERED: 
August 18, 2011









[1]Probable cause to arrest
exists when, at that moment, the facts and circumstances within the knowledge
of the arresting officer and of which he has reasonably trustworthy information
would warrant a reasonable and prudent man in believing that a particular
person has committed or is committing a crime.  Jones v. State, 493
S.W.2d 933, 935 (Tex. Crim. App. 1973).





[2]The seminal cases
analyzing midstream Miranda warnings all use the same analysis to
determine the subsequent effectiveness of both Miranda and article 38.22
warnings.  See Carter v. State, 309 S.W.3d 31, 36 (Tex. Crim. App. 2010)
(analyzing midstream Miranda warnings and article 38.22 warnings with
singular analysis); see also Martinez v. State, 272 S.W.3d 615,
622–23 (Tex. Crim. App. 2008) (same); Ervin v. State, 333 S.W.3d 187,
213–14 (Tex. App.—Houston [1st Dist.] 2010, pet. ref’d), cert. denied,
--- S. Ct. ----, No. 10-9555, 2011 WL 999357 at *1 (U.S. June 13, 2011)
(same).